1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VICTOR MANUEL RENDEROS,

           Petitioner,

  v.

STUART J. RYAN, Warden,

           Respondent.

No. C 04-05250 CRB

**MEMORANDUM AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

     After a jury trial, Victor Manuel Renderos, was convicted in Alameda County Superior Court of twenty-six counts of various sex offenses involving a minor under the age of fourteen, committed between May 1, 1992 and September 19, 1994.  The statute of limitations for the offenses was six years under California Penal Code section 800.  Before the six-year period expired for any of the offenses, however, the Legislature enacted section 803(g), which permits the filing of a criminal complaint within one year of the victim's report of the offenses so long as they involve defined substantial sexual conduct against minors and there is independent evidence that clearly and convincingly corroborates the allegations.  The jury found that the section 803(g) requirements had been met and the People had timely commenced the prosecution.

     Renderos now brings a petition for writ of habeas corpus arguing that with respect to his case California revived the statute of limitations in violation of the Ex Post Facto

Clause of the United States Constitution.  Petitioner also argues that the trial court committed several other evidentiary and legal errors that violated his rights to due process and a fair trial.  After carefully considering the papers submitted by the parties, the Court hereby DENIES the petition for the reasons stated herein.  As applied here, section 803(g) did not revive the limitations period for Renderos's crimes, but instead merely extended it.  The statute is therefore not an unconstitutional ex post facto law.

## BACKGROUND

The California Court of Appeal summarized the facts of this case as follows:

In the 1990s, Renderos, then in his early fifties, dated Lisa C., who had two children, Ryan, who was under 14 years old, and his younger brother, Jordan.  Renderos spent a lot of time with Lisa and her sons.  On an almost daily basis, after he finished work, Renderos went to Lisa's home for dinner and he then spent the evening with Lisa and her sons before he returned to his home.  Renderos was also present at holiday dinners and birthdays and he took trips with Lisa and her sons.  Ryan thought of Renderos like a father.  However, over a two-year period from May 1992 continuing to mid-September 1994, Renderos molested Ryan on numerous occasions.

Ryan was eighteen years old at the time of trial.  He described in detail the first two incidents that happened when he was eight years old.

The first incident occurred during a family trip to the Russian River.  According to Ryan, it was spring but hot enough to go swimming.  While Lisa remained on shore, Renderos and Lisa's sons went canoeing and then stopped near some bushes to urinate.  Renderos and Ryan were standing at one bush, while Jordan was standing nearby at another bush.  After urinating, Renderos took Ryan's hand, placed it on his (Renderos's) penis, and told Ryan to keep his hand there.  Ryan left his hand there for a few seconds and then removed it.  Driving home, Ryan rode with Renderos in his truck while Lisa and Jordan rode home in her car.  Ryan did not tell anyone about the incident.

The second incident occurred about two months later.  Renderos was at Ryan's home for the nightly dinner with the family.  After dinner, Ryan's mother left the house to attend to her real estate business.  Ryan was in his bedroom changing his clothes when Renderos came in.  Renderos reached through the opening in Ryan's boxer shorts, and pulled on Ryan's penis for a few seconds.  Renderos then had Ryan place his own hand on Renderos' penis, and "jack [Renderos] off" until he ejaculated.  No words were spoken during this incident.  Ryan then got dressed, and he went into another room to watch television.  Ryan did not say anything to anyone about the incident.

The sexual abuse, which Ryan described as "touching, the[n] me jacking him off," continued on a more frequent basis as Ryan got closer to nine, with the third incident happening "a little bit after" the second incident, and then on an almost nightly basis, "at least once every three days."  Ryan, however, was unable to recall how many times he was molested while he

was still eight years old.  But, he testified the abuse occurred from the time he was eight years old . . . "[a]nd it started stopping when [he] was getting close to eleven.  When [he] got to eleven, it just stopped."  Ryan further testified from the time the sexual activity started until the time it ended, it occurred each month during that period of time; and once the molestation started, there were never any months when Renderos did not molest him.

In addition to the forced masturbation, Ryan testified he was eight to nine years old when Renderos first used his finger to penetrate Ryan's rectum.  When Ryan was nine or ten, on one occasion he was forced to orally copulate Renderos, on a few occasions Renderos used his finger to penetrate Ryan's rectum, and on one occasion Renderos used his penis to penetrate Ryan's rectum.

About one year before the trial, when Ryan was seventeen, his girlfriend confided she had been molested, and in response, Ryan told his girlfriend he too was molested.  His girlfriend encouraged Ryan to tell his mother about Renderos' conduct.  Ryan testified once he spoke with his mother, "all my problems just stopped almost."  Ryan had not previously said anything to his mother about the sexual abuse because he was afraid he would get in trouble and because the incidents made him feel gay.  Ryan further testified a few months after the Russian River incident, Renderos told him not to talk about their sexual encounters; Renderos said he (Renderos) would get in trouble and Ryan should not discuss the matter with his mother.  According to Detective James Matthews, Jr., Ryan reported he thought Renderos would kill his mother if he said anything about the abuse.

On March 19, 2001, Ryan reported the abuse to the police who recorded a statement from Ryan.  One month later on April 20th, at the police station, Detective Matthews had Ryan place two telephone calls to Renderos in which Ryan asked Renderos whether he remembered the molestations and why Renderos had molested him.  During the first telephone call, Ryan questioned Renderos about the first incident at Russian River and why Renderos always touched Ryan when he was little.  Renderos at first stated he did not remember the trip or always touching Ryan when he was little.  Renderos then stated, "But don't worry about shit like that, Man.  That was something that, you know, happened a long time ago and that you—we just did some playing around, you know? . . . No big thing."  Ryan prefixed the second telephone call by asking Renderos for counseling on a problem.  To which Renderos told Ryan, "Hey, come on over, Man.  You know . . . things like that happen—Hey, it was just—you was crazy at the time.  You remember that. . . . You know, you were crazy and you want to experiment things, you know and things like that.  You're the one that motivated the whole thing, you know?  Just let the guilt out of your head."  Ryan then stated he was having sexual problems with his girlfriend, to which Renderos replied Ryan should not smoke any dope.  Ryan replied he had not used any dope for six or seven months.  When Ryan further stated he was bothered by Renderos' act of "always like make me put my hand on your penis . . . ," Renderos replied, "Oh well, you know?  You—you wanted to do that.  You know remember?  You wanted to."  When Ryan said he was eight years old, Renderos claimed:  "You were about 12, Man.  You were old, already. . . . I didn't meet you when you was eight.  You were older than that."  When Ryan again stated it was not normal for guys to grab each other's dicks, Renderos replied, "Oh, it's a—I know.  Yeah, I couldn't figure out why you want to do it.  Remember that?"  When Ryan said he did

not really want to do it but Renderos got his hand, Renderos replied, "No, you're . . . the one. You started out, remember, you wanted to experiment crazy things. You . . . were always doing crazy things. Remember that? When Ryan again said he did not understand why Renderos wanted Ryan to try to suck his dick because it was like Renderos was using Ryan to get what he wanted, Renderos replied, "Oh, no, no, no, no, no. Huh-uh. No, no. You got me wrong. You want to experiment things. You want to fuck around with this. You want to do that. You want to do this. You want to do that. [¶] You're the one that always wanted it. Remember the way you are, Man. The way you used to be. [¶] You want to do this, you want to do that. . . . I didn't force you into doing anything. You're the one that motivated everything. [¶] Think about that." Ryan stated he did not know how he had motivated the sex because he was young, to which Renderos replied, "Well, you knew what you were doing, Bro." The remainder of the telephone conversation, which is set out in the margin of the opinion, continued in the same vein, with Ryan continuing to ask Renderos if he remembered the sexual encounters, and Renderos telling Ryan to forget about the incidents.[1] Five days after the telephone conversations, on April 25, 2001, the People filed a criminal complaint against Renderos, charging him with various felony sex offenses.

Renderos testified on his own behalf and denied molesting Ryan on any occasion. He claimed that he met Lisa somewhere around 1992 or 1993, and he dated her for about three or four years. Renderos could not recall

---

[1] The relevant part of the transcript of the recorded second telephone call reads as follows:

Q. [Ryan]: . . . I just think it's not normal for like you know, an older man to grab a kid's hand and put it on his dick.
A. [Renderos]: Oh, forget about that shit, you want to . . . do things like that when you were younger, you want to do this, you want to experiment different things.
Q. But you remember, you would grab my dick too. I mean—
A. You forget about these things. Just forget about those things and—like I tell you, concentrate on now. Don't—forget about then. Forget about that shit, Man. Concentrate on your girl. . . .
****
Q. I just don't get why you would grab me and shit, you know? That just bothers me.
A. Well, just forget about that shit, Man. Forget about the shit. Hey, come on over some day and we talk about it and get this in the open. . . .
Q. You're not [g]ay, are you?
A. Fuck, no. . . .[¶]
Q. Yeah?
A. I love pussy, Man. You know me better than that. . . .
Q. But then why'd you grab me, Dude?
A. Forget about things like that. You were grabbing me you know and I was, you know, we were just fuckin' around and just forget about that shit.
Q. All right. All right.
A. Put it in the . . . past, forget about it, don't think about it and then when you want to [b]ullshit, come on over we can talk about it and . . . get it in the open between you and me and then . . . it won't bother you no more.

Ex. D at 5-6.

how old Ryan was when he first met the boy; he claimed Ryan must have been around ten years old.  He confirmed Ryan's testimony that after he started dating Lisa, he ate dinner at Lisa's home on an almost nightly basis.  However, Renderos claimed that practically every night he was at Lisa's home, after the boys were asleep, he and Lisa had intimate relations in her bedroom and then he left at about 11:00 p.m.[2]  Renderos claimed Lisa did not work "that much" at night.  He recalled caring for the boys on only five occasions.

Renderos explained his statements in the recorded telephone calls with Ryan referred to incidents that took place when Ryan was eleven or twelve years old.  Specifically, on a few occasions, after having sex with Ryan's mother, Renderos came out of Lisa's bedroom to find Ryan outside the bedroom door.  Renderos recalled Ryan saying, "[H]ow do [you] like my mother's . . . female part."  Then, Ryan would grab Renderos' penis through his clothes.  Renderos told Ryan to stop touching him.  The incidents happened on five occasions and then they just stopped.  Renderos told Lisa about the incidents, suggesting they have intimate relations later in the evening.  During the two telephone calls with Ryan in April 2001, Renderos thought Ryan was referring to the incidents when Ryan had waited for him outside Lisa's bedroom and grabbed his penis as he emerged from the room.  Renderos claimed all the statements he made on tape were references to those incidents instigated by Ryan.

Renderos was found guilty of one count of committing continuous sexual abuse (during a four month period when Ryan was eight years old), one count of oral copulation (when Ryan was nine or ten years old), one count of sexual penetration with a foreign object (when Ryan was ten years old), and 23 counts of committing a lewd act on a child under 14 (each count covering a one-month interval from September 1, 1992 through July 31, 1994 when Ryan was eight, nine, and ten years old).  The jury also found true factual allegations under section 803(g) making the prosecution timely as to each offense of which they found Renderos guilty.  The trial court sentenced Renderos to an aggregate term of 66 years in prison.

Ex. D at 2-7 (footnotes renumbered).

On December 30, 2003, the California Court of Appeal affirmed petitioner's sentence, and on April 14, 2004, the California Supreme Court denied review.  Petitioner then filed a petition for a writ of habeas corpus under 28 U.S.C. section 2254 seeking summary reversal of his convictions, arguing the prosecution was barred by the six-year statute of limitations and any extension under section 803(g) was unconstitutional.

/ / /

/ / /

---

[2] Ryan's mother testified she usually had intimate relations with Renderos at his home and not in the presence of the children.  She further testified there might have been a time when she was intimate with Renderos in her home after the children went to bed but she could not recall any such occasion.  Ex. D at 6.

5

1

**DISCUSSION**

2 **I.   Standard of Review**

3        This Court may entertain a petition for writ of habeas corpus "in behalf of a person

4 in custody pursuant to the judgment of a State court only on the ground that he is in

5 custody in violation of the Constitution or laws or treaties of the United States."  28

6 U.S.C. § 2254(a).

7        The writ may not be granted with respect to any claim that was adjudicated on the

8 merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

9 decision that was contrary to, or involved an unreasonable application of, clearly

10 established Federal law, as determined by the Supreme Court of the United States; or (2)

11 resulted in a decision that was based on an unreasonable determination of facts in light of

12 the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

13        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

14 state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

15 question of law or if the state court decides a case differently than [the] Court on a set of

16 materially indistinguishable acts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).

17 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

18 the state court identifies the correct governing legal principle from [the] Court's decisions

19 but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.

20        "[A] federal habeas court may not issue the writ simply because the court

21 concludes in its independent judgment that the relevant state court decision applied

22 clearly established federal law erroneously or incorrectly.  Rather, that application must

23 also be unreasonable."  <u>Id.</u> at 411.  A federal habeas court making the "unreasonable

24 application" inquiry should ask whether the state court's application of clearly-established

25 law was "objectively unreasonable."  <u>Id.</u> at 409.

26        The only definitive source of clearly-established federal law under 28 U.S.C.

27 section 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the

28 time of the state court decision.  <u>Id.</u> at 412; <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th

United States District Court

For the Northern District of California

Cir. 2003).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.  Id.

## II.    Petitioner's Claims

Renderos claims that: (1) application of California Penal Code section 803(g) extending the statute of limitations for the underlying criminal action was a violation of the Ex Post Facto Clause of the United States Constitution, (2) the burden of proving the timeliness of a prosecution under the statute of limitations requires proof beyond a reasonable doubt, not merely clear and convincing evidence, (3) the trial court violated his right to a fair trial and due process by permitting propensity evidence and not providing appropriate limiting instructions, (4) the trial court's failure to provide standard jury instructions CALJIC 2.01 and CALJIC 2.71 sua sponte violated his right to a fair trial and due process, (5) his right to due process was violated by the prosecution's improper reference to testimony in closing argument; (6) trial counsel was ineffective, and (7) the cumulative effect of all these alleged errors violated his right to due process.

### A.    Statutory Extension of Statute of Limitations

Petitioner claims that California Penal Code section 803(g) is an unconstitutional ex post facto law as applied to prosecutions based on allegations of post-1987 molestation.  That law provides:

> (1) Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section 261, 286, 288, 288a, 288.5, 289, or 289.5.
>
> (2) This subdivision applies only if all of the following occur:
>
> > (A) The limitation period specified in Section 800, 801, or 801.1, whichever is later, has expired.
> >
> > (B) The crime involved substantial sexual conduct, as described in subdivision (b) of Section 1203.066, excluding masturbation that is not mutual.

7

(C) There is independent evidence that corroborates the victim's allegation. If the victim was 21 years of age or older at the time of the report, the independent evidence shall clearly and convincingly corroborate the victim's allegation.

(3) No evidence may be used to corroborate the victim's allegation that otherwise would be inadmissible during trial. Independent evidence does not include the opinions of mental health professionals.

Renderos was convicted of criminal conduct falling within section 803(g) committed between May 1, 1992 and September 19, 1994. Charges were brought against Renderos on April 25, 2001, outside of the six-year limitations period imposed by section 800 of the California Penal Code. Therefore, the charges would have been dismissed but for the extension of the limitations period by section 803(g).

The California Court of Appeal found no ex post facto bar to the charges on which petitioner was tried and convicted. See People v. Renderos, 114 Cal.App.4th 961 (Cal. Ct. App. 2003). The Court relied centrally on Stogner v. California, 539 U.S. 607 (2003), which held section 803(g) unconstitutional under the Ex Post Facto Clause as applied to cases in which the six-year statute of limitations had expired prior to January 1, 1994, the effective date of the statute. See Renderos, 114 Cal.App.4th at 965. "The [C]ourt, however, expressly noted its holding did not affect or otherwise 'prevent the State from extending time limits . . . for prosecutions not yet time barred.'" Id. (quoting Stogner, 539 U.S. at 632). The Court of Appeal found that as applied to Renderos's case, section 803(g) operated as an extension of the unexpired six-year statute of limitations and was therefore not unconstitutional. Id.

The court rejected Renderos's argument that the text of the section 803(g), which states that it applies only if "the limitation period specified in section 800 or 801 has expired," id. (quoting Cal. Penal Code § 803(g)), transforms it into a revival statute. Renderos claimed that this requirement means that the six-year statute of limitations expired on his offenses and was revived when the victim filed a report. See id. The Court disagreed:

United States District Court

For the Northern District of California

Subdivision (g) of section 803, provides: "*Notwithstanding any limitation*" in section 800 or 801, the People may pursue a prosecution of certain sexual offenses involving minors within one year from the time a victim files a report.  The proviso that the subsection does not apply unless the statute of limitations has expired in section 800 or 801 "obviously ensures that the one-year period in section 803(g)(1) does not override or otherwise conflict with sections 800 or 801 where the victim reports the crime to a qualifying law enforcement agency before the three-year or six-year period set forth in the latter provisions 'has expired.'  In this way, the limitations period in section 803(g)--like other 'tolling' and 'extension' provisions in the same statute--serves to prolong, rather than shorten, the time in which a felony child molestation prosecution may be commenced." . . . .  Thus, for those offenses committed before January 1, 1994, but where the statute of limitations in sections 800 or 801 had not yet expired as of that date, section 803(g) can be read as "extending" the statute of limitations so that a prosecution is timely if it is commenced no more than one year after a victim reports the abuse to an appropriate law enforcement agency.  That the People could not prosecute the action until a report was filed by Ryan, does not support Renderos's contention the statute as applied to him had the effect of "reviving" a prosecution barred by the statute of limitations.  Because the statute of limitations under section 800 had not expired when section 803(g) became effective on January 1, 1994, section 803(g) permitted the People to commence prosecution for the offenses within one year after the filing of Ryan's report of abuse, notwithstanding the limitation period in section 800.

Id. at 965-66 (emphasis in original, footnotes and citations omitted).   This Court agrees with the construction given to the statute by the California Court  of Appeal.

That the Court of Appeal's holding is correct is further supported by a closer analysis of Stogner.  There, the Supreme Court held that "a law enacted after expiration of a previously applicable limitations period violates the Ex Post Facto Clause when it is applied to revive a previously time-barred prosecution."  539 U.S. at 632-33.  The Court found section 803(g) to be an ex post facto law as applied to pre-1988 molestations because the limitations period had expired prior to enactment of the statute.[3]  The Court gave two reasons for its holding.

First, the Court found that the statute threatened the kind of harm that the Ex Post Facto Clause seeks to avoid because it had a "manifestly unjust and oppressive retroactive effect[]."  Id. at 611 (internal quotations omitted).  "[E]xtending a limitations period after

---

[3] The distinction between 1987 and 1988 is significant.  When section 803(g) first became effective on January 1, 1994, the existing statute of limitations for child molestation was six years.  The existing six-year limitation period expired for pre-1988 claims *before* section 803(g) was enacted, but not for post-1987 claims.

the State has assured 'a man that he has become safe from its pursuit . . . seems to most of us unfair and dishonest." Id. (citation and internal quotations omitted).  Doing so deprives the defendant of fair warning that may have led the defendant to preserve exculpatory evidence.  Id.

As a second reason, the Court found that the law fit within one of the classic definitions of an ex post facto law because it "aggravates a crime, or makes it greater than it was when committed."  Id. at 613 (quoting Calder v. Bull, 3 U.S. 386, 390 (1798)). The Court elaborated that the statute is such a law as applied to pre-1988 conduct because it "inflict[s] *punishments*, where the party was not, by *law*, liable to any *punishment*."  Id. (quoting Calder, 3 U.S. at 389) (emphasis in original).  This type of law was contrasted with laws that bring about a "[r]etroactive extension of unexpired statutes of limitations." Id. at 630-31.  Those laws do not offend the Ex Post Facto Clause in light of "history, case law, and constitutional purposes." Id.; see also United States v. Bischel, 61 F.3d 1429, 1435-36 (9th Cir. 1995).

The distinction drawn by the Supreme Court makes clear that the California Court of Appeal reasonably interpreted section 803(g) as an "extension" statute as applied against post-1987 offenses, and not as an unconstitutional "revival" statute.  It read the proviso that the subsection does not apply unless the statute of limitations "has expired"[4] as "ensur[ing] that the one-year period in section 803(g)(1) does not override or otherwise conflict with sections 800 or 801 where the victim reports the crime to a qualifying law enforcement agency before the three-year or six-year period set forth in the latter provisions 'has expired.'" 114 Cal.App.4th at 966-67.

In focusing on the term "expired" petitioner has placed too much emphasis on the formal language of the statute and too little on its practical effect.  In practice, for conduct occurring after 1987, the statute of limitations never expires because the transition from the six-year limitations period to subdivision (g)'s flexible limitation period is seamless. The defendant never becomes "safe from [the law's] pursuit," and has not been deprived

_____

[4] California Penal Code § 803(g)(1)(A).

1  of "fair warning" that he should preserve exculpatory evidence.  See Stogner, 539 U.S. at

2  611.  Nor does the statute, as applied here, inflict a punishment where the defendant

3  previously was not liable for one.  See id. at 613.  Contrary to petitioner's insistence, the

4  statute does not authorize a previously-barred criminal prosecution; the prosecution is

5  never barred until one year has expired after a victim reports the crime.  Prior to that

6  moment, there is not one microsecond in which the defendant is ever safe from

7  prosecution under the statutory scheme.  The "expiration" requirement of section 803(g)

8  was introduced for the specific purpose of ensuring that no defendant can escape

9  prosecution because of the interplay between sections 800, 801 and 803(g).  See

10  Renderos, 114 Cal.App.4th at 966.  It would be a strange thing indeed to give the statute

11  an interpretation which would have the opposite effect.

12       Under the Court of Appeal's view, there are two separate statutes of limitation for

13  the crime committed in this case, each of which applies co-equally.  The first, section 800,

14  imposes a six-year statute of limitations and accrues at the commission of the offense.

15  See Cal. Penal Code § 800.  The second, section 803(g), imposes a one-year statute of

16  limitations and accrues when: (1) the statute of limitations under section 800 expires and

17  (2) the victim reports the crime to a California law enforcement agency.  See Cal. Penal

18  Code § 803(g).  Even when section 800's six-year period expires, the statute of limitations

19  under section 803(g) has not yet expired because it has not yet accrued.  This is therefore

20  not a case in which "the State has, in effect, granted an amnesty" and "retroactively

21  withdraw[n] a complete defense to prosecution after it has already attached."  Stogner,

22  539 U.S. at 632.

23       In finding that section 803(g) extends the limitations period before it expires as

24  applied to post-1987 offenses, the state appellate court ruling was not contrary to, or an

25  unreasonable application of, clearly established Supreme Court precedent as defined by

26  Stogner.  Although petitioner disputes the California Court of Appeal's reading of section

27  803(g), this Court must show deference to that court's interpretation of state law.  See

28  New Hampshire Ins. Co. v. Vieira, 930 F.3d 696, 701 (9th Cir. 1991) (Federal courts are

United States District Court

Eastern Northern District of California

11

United States District Court

For the Northern District of California

1   bound to state court interpretations of state law unless they are convinced that the highest

2   court of the state would decide otherwise.); see also Murtishaw v. Woodford, 255 F.3d

3   926, 964-65 (9th Cir. 2001) (In applying federal ex post facto prohibition to state law, a

4   federal court accepts the meaning ascribed to the state law by the state's highest court.).

5   The California Court of Appeal's interpretation of section 803(g) is entirely reasonable

6   and a fair indication of how the California Supreme Court would view the statute.

7   Therefore, the state court's characterization of section 803(g) stands and petitioner's ex

8   post facto challenge fails.

9           **B.     Sufficiency of Evidence for Supporting Timeliness of Prosecution**

10          Petitioner claims that the statute of limitations is an element of the offense and any

11  evidence supporting timeliness of prosecution under section 803(g) must be proven

12  beyond a reasonable doubt.

13          The California Court of Appeal held that petitioner's right to due process was not

14  violated by the trial court's instruction that the burden of proof on the factual allegations

15  under section 803(g) was by clear and convincing evidence, and not the higher burden of

16  proof beyond a reasonable doubt. Ex. D at 16-18.  The court ruled that, although the

17  statute of limitations is an "element" of the offense under California law, the state's

18  Supreme Court has consistently held that the element need only be proven by a

19  preponderance of the evidence. Id. at 17.  The court also pointed out that no United

20  States Supreme Court case has ever extended to statutes of limitations the rule of

21  Apprendi v. New Jersey, 530 U.S. 466, 476, 490 (2000) that any fact other than a prior

22  conviction that increases the maximum punishment must be proven beyond a reasonable

23  doubt.  See id.  In response to petitioner's reliance on Grunewald v. United States, 353

24  U.S. 391, 396 (1957), the court found that the case "does not expressly state the statute of

25  limitations applicable for the crime of conspiracy needs to be proved beyond a reasonable

26

27

28                                              12

United States District Court

For the Northern District of California

1   doubt."[5]  Id.  Grunewald and its progeny[6] are also distinguishable because they treat the

2   statute of limitations as coinciding with the overt act element of a charge of conspiracy,

3   which clearly must be proven beyond a reasonable doubt.  Id.  In contrast, accrual under

4   section 803(g) does not coincide with any element of the underlying offense.  Id.

5   Therefore, the Court of Appeal found no basis in federal law for finding that the trial

6   court's jury instruction was error.

7        The Court of Appeal's reasoning is persuasive and should not be disturbed.

8   Petitioner fails to cite any Supreme Court case that has expressly indicated that the

9   beyond-a-reasonable-doubt standard applies to the statute of limitations for a criminal

10   offense.  Indeed, petitioner admits that "[f]ederal law concerning whether a criminal

11   statute of limitations is an element of the offense that must be proven beyond a reasonable

12   doubt has been somewhat less clear" than California courts' pronouncements on the

13   subject.  Petitioner's Memorandum at 9.  Therefore, at best, the state of the law on this

14   subject is ambiguous and there is no "[c]learly established federal law, as determined by

15   the Supreme Court" which supports habeas relief.  28 U.S.C. § 2254(d)(1); see also

16   Mitchell v. Esparza, 540 U.S. 12, 17 (2003) (per curiam) ("A federal court may not

17   overrule a state court for simply holding a view different from its own, when the

18   precedent from [the Supreme Court] is, at best, ambiguous.").

19        Petitioner also suggests that Stogner, by holding that the Ex Post Facto Clause bars

20   revival of an expired statute of limitations, somehow converted the statute of limitations

21   into an "element" of the offense, thereby requiring proof beyond a reasonable doubt.  He

22   _____

23   [5]Grunewald states only that "[i]t was . . . incumbent on the Government to prove
that the conspiracy, as contemplated in the agreement as finally formulated, was still in
existence on October 25, 1951, and that at least one overt act in furtherance of the

24   conspiracy was performed after that date."  353 U.S. at 396.  In addition, the Court quotes
the trial court, which had instructed the jury that the timing of the overt act element must

25   have been found beyond a reasonable doubt.  See id. at 412.  However, the Court did not
discuss the appropriateness of this component of the trial court's instruction.

26   [6]See United States v. Andreen, 628 F.2d 1236, 1248 (9th Cir. 1980); United States
v. Brown, 936 F.2d 1042, 1049 (9th Cir. 1991); United States v. Fuchs, 218 F.3d 957, 967

27   (9th Cir. 2000) (Graber, J., dissenting).

28                                          13

relies on the Court's statement that the statute of limitations determines whether or not the

defendant is liable for punishment, 539 U.S. at 613, to argue that it must therefore be an

element of the offense.  However, there is nothing remarkable about the fact that the

statue of limitations is one of many factors that may be determinative of a defendant's

liability.  The Supreme Court's recognition of this common-sense fact did not trigger any

watershed change in the law.  Had the Supreme Court desired to use a decision regarding

the Ex Post Facto Clause as a vehicle to effect a sea change in the due process

requirements for charging and proving almost all criminal cases in the country, it surely

would have expressed its intentions with far greater clarity.  Thus, the California Court of

Appeal's determination that the Due Process Clause does not require the statute of

limitations under section 803(g) to be proven beyond a reasonable doubt was not contrary

to, or an unreasonable application of, clearly established Supreme Court precedent.  <u>See</u>

28 U.S.C. § 2254(d).

**C.      Admission of Propensity Evidence and Absence of Limiting Instructions**

Petitioner claims that his right to due process was violated by his trial court's

admission of a portion of the tape of his telephone calls with Ryan seeking to procure an

underage female prostitute.  He also argues that the trial court erred by admitting, without

a limiting instruction, other telephone conversation excerpts in which he and Ryan

discussed some of the charged acts.  According to petitioner, these statements were the

only corroboration[7] evidence of other charged acts that were not discussed.  He contends

that admission of each of these types of "propensity" evidence rendered his trial unfair.

**1.      Conversations Regarding Petitioner's Interest in a Prostitute**

The California Court of Appeal held that petitioner had waived this claim by

failing to object on this constitutional basis at trial.  Ex. D at 23.  Alternatively, the state

---

[7]  Section 803(g)(2)(C) requires there to be "independent evidence that corroborates the victim's allegations."

14

1    appellate court also rejected the claim on the merits, finding that admission of the

2    evidence was harmless error because "[t]he prejudicial effect of the evidence was

3    minimal given that it 'was no stronger and no more inflammatory than the [evidence]

4    concerning the charged offenses.'" Id. (quoting People v. Ewoldt, 7 Cal.4th 380, 405

5    (Cal. 1994)).

6                    **a.    Procedural Default**

7           The Ninth Circuit has repeatedly held that California's contemporaneous objection

8    rule, which requires objection at the time of trial to preserve an issue for appeal, is an

9    adequate procedural bar to federal habeas review (including where the petitioner raised

10   only an evidentiary, not a constitutional objection, at trial).  See, e.g., Davis v. Woodford,

11   384 F.3d 628, 653-54 (9th Cir. 2004); Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir.

12   1999); Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981).[8]

13          The California Court of Appeal's invocation of the contemporaneous objection

14   rule here accordingly precludes federal review of petitioner's claim unless petitioner can

15   demonstrate cause for the default and actual prejudice as a result of the alleged violation

16   of federal law, or demonstrate that failure to consider the claim will result in a

17   fundamental miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 750

18   (1991).  Petitioner fails to make such a showing here.  His Fourteenth Amendment claim

19   is therefore barred from federal habeas corpus review.  See Davis, 384 F.3d at 653-54.

20                  **b.    Denial on the Merits**

21          Even if petitioner's claim were not procedurally barred, it would still fail because

22   petitioner has not met the high burden for showing that the admission of the prior acts

23   evidence violated his due process rights.  Such relief is not granted unless the admission

24

25          [8] The Ninth Circuit's decision in Melendez v. Plieler, 288 F.3d 1120 (9th Cir.
     2002), is not to the contrary.  In Melendez, the court simply recognized that "there are no
26   California cases holding that the [contemporaneous objection] rule is applied consistently
     in situations in which an objection is made but the trial court in its discretion declines to
27   consider it on the merits."  288 F.3d at 1125 (emphasis in original).  That was not the
     situation here.

28                                          15

**United States District Court**

United States District Court

For the Northern District of California

1    of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally

2    unfair.  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); see also Jammaal v.

3    Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  The challenged evidence was admitted

4    "to describe the relationship between the alleged victim and the defendant," Ex. D at 23,

5    which was relevant to the plaintiff's credibility.  It was not arbitrary for the trial court to

6    admit it on those grounds, and the Court of Appeal was not unreasonable to find the

7    admission harmless error.

8                    **2.    Conversations Regarding Other Charged Acts**

9           The Court of Appeal ruled that evidence of similar sexual misconduct may be

10   introduced to corroborate, for section 803(g) purposes, a victim's account of other,

11   charged, misconduct.  See Ex. D at 13.  According to the court, "[t]he jury could

12   reasonably find all the sexual offenses were so significantly similar in nature to each other

13   and occurred in such close temporal proximity to each other that Renderos's telephone

14   statements . . . clearly and convincingly corroborated Ryan's testimony regarding all the

15   acts of abuse."  Id.

16          Petitioner cites no federal precedent which supports the principle that the

17   admission of propensity evidence to support a charge of child molestation violates due

18   process.  Indeed, it is common among jurisdictions in the United States to allow such

19   evidence to be admitted for precisely that purpose.  See, e.g. Federal Rule of Evidence

20   414 (allowing evidence of similar crimes in child molestation cases).  Recognizing this

21   fact, the Ninth Circuit has held that "there is nothing fundamentally unfair about the

22   allowance of propensity evidence" against a defendant prosecuted for child molestation.

23   United States v. LeMay, 260 F.3d 1018, 1026 (9th Cir. 2001).  Petitioner's claim

24   therefore fails.

25   / / /

26   / / /

27

28                                              16

**D.     Trial Court's Incomplete Instruction Under CALJIC No. 2.71**

Petitioner claims that his right to a fair trial and due process was violated by the trial court's failure to read the cautionary third sentence of CALJIC No. 2.71 sua sponte relating to jury consideration of out-of-court oral statements by petitioner.  The California Court of Appeal characterized the error as follows:

> Without objection, the trial court instructed the jury on its consideration of Renderos's statements using only the first two sentences in CALJIC No. 2.71, as follows: "An admission is a statement made by [a][the] defendant which does not by itself acknowledge [his][her] guilt of the crime[s] for which the defendant is on trial, but which statements tends to prove [his][her] guilt when considered with the result of the evidence.  [¶]  You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part."  The court did not use the third sentence of CALJIC No. 2.71, which would have instructed the jury that "[e]vidence of an oral admission of [a][the] defendant not made in court should be viewed with caution" (cautionary instruction).
>
> Renderos now argues the trial court committed prejudicial error by failing to give the cautionary instruction sua sponte.  He concedes the trial court was not required to instruct the jury to view with caution his telephone statements, which were recorded by the police.  However, he contends the cautionary instruction was required regarding Ryan's testimony as to the following statements: (1) (during the Russian River incident) Renderos told Ryan to leave his (Ryan's) hand on Renderos's penis; (2) (during a discussion between Ryan and Renderos prompted by Ryan asking Renderos if he had ever been in jail) Renderos stated, "there are consequences for everything"; and (3) (months after the Russian River incident) Renderos told Ryan not to talk about their sexual encounters; Renderos said he (Renderos) would get in trouble, and Ryan should not discuss the matter with his mother.

Ex. D at 27-28 (footnotes and citations omitted).

The state appellate court held that under state law, even though the cautionary instruction should have been read to the jury, the error was harmless and reversal was not warranted.  Id. at 28.  This Court agrees.

The applicable standard is whether the defective instruction "so infected the entire trial that the resulting conviction violates due process."  Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotation marks and citations omitted).  Moreover, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the

17

context of the overall charge." Id. "If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Id.; see also Estelle v. McGuire, 502 U.S. 62, 72 (1991) ("Federal habeas courts . . . do not grant relief . . . simply because the instruction may have been deficient in comparison to the CALJIC model.").

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see, e.g., Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding Brecht error where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'") (citation omitted).

Here, the California Court of Appeal reasonably determined that actual prejudice had not occurred. It noted that the jury was fully instructed "'on judging the credibility of a witness, thus providing guidance on how to determine whether to credit [Ryan's] testimony'"; the statements were not "'a substantial part of evidence offered to establish the prosecution's case'" and "were not vitally important evidence"; and "[g]iven the nature of Renderos's telephone statements, which were not subject to the cautionary instruction, we cannot say the verdict would have been different had the jury been told to view with caution [petitioner's] other extrajudicial statements." Ex. D at 29. For the same reason, petitioner's claim for habeas relief fails.

/ / /

/ / /

/ / /

**E.      Trial Court's Improper Instruction on CALJIC No. 2.01**

Petitioner claims that his due process right was violated by the trial court's additional comments to CALJIC No. 2.01, which he claims interjected a one-sided example of circumstantial evidence that favoring the prosecution.

The California Court of Appeal rejected petitioner's argument:

> Without objection, the trial court instructed the jury on the meaning of circumstantial and direct evidence, and the meaning of "inference," as follows: "Evidence is either direct or circumstantial. [¶] Direct evidence is evidence that directly proves a fact. It is evidence which by itself if found to be true establishes the fact. [¶] Circumstantial evidence is evidence that if found to be true proves a fact from which an inference of the existence of another fact may be drawn. [¶] An 'inference' is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. [¶] Direct evidence often times is considered eye witness evidence. Somebody that has seen an act and describes it in court. [¶] Circumstantial evidence, I'll give you an example. *Let's assume this is a case where a person is accused of breaking into a jewelry store. And the facts are that somebody broke the glass in the jewelry store in front of the store, grabbed some jewelry and ran. No one saw those acts, but a person is caught within a block or two of the store, and in the cuffs of the pants of the individual, they find broken glass that matches the glass that was broken from the front of the store. Also that he's in possession of jewelry that is identified from being taken from that store. The fact there is glass in the cuffs of the individual, and the fact that he was in possession of jewelry is circumstantial evidence tending to prove guilt.* That's kind of an example of what direct and circumstantial evidence is. [¶] It is not necessary the facts be proved by direct evidence. They may be proved also by circumstantial evidence or a combination of direct and circumstantial evidence. Both direct and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other."

> Renderos now challenges the italicized language of trial court's instruction, arguing that "this one-sided example suggested to the jury that circumstantial evidence is always highly probative of guilt, giving a false significance to such evidence." He further argues that although the prosecution's evidence in support of the charges is primarily Ryan's direct testimony he had been sexually abused, the "corroborating" evidence required under section 803(g) was almost entirely circumstantial, consisting of Renderos's telephone statements. Accordingly, Renderos argues even if the court had not given the challenged example, the court should have instructed sua sponte using the language in CALJIC No. 2.01, which, in pertinent part, informs the jury circumstantial evidence is no more probative than any other evidence and should be evaluated carefully. Renderos concludes by arguing: "Having given the argumentative example, it was incumbent upon the trial court to correct any false impression the jury might have gotten by giving CALJIC No. 2.01."

19

1

2

3

4

5

6

7

> Initially, we note Renderos waived his right to appellate review of the jury instructions on the issue of circumstantial evidence by failing to object to the instruction or requesting clarification of the instruction at the trial level. In any event, he has failed to show how the instruction affected his fundamental rights.  The correctness of jury instructions is determined from the entire instructions given by the court and not from isolated parts of instructions.  The example of circumstantial evidence did not suggest to the jury that "circumstantial evidence is always highly probative of guilt," as argued by Renderos.  Consequently, the trial court was not required to correct any misimpression by instructing the jury using the language in CALJIC No. 2.01.  The trial court was not otherwise under any duty to instruct the jury using the language in CALJIC No. 2.01 on its own initiative.

8    Ex. D at 25-26 (citations omitted) (emphasis in original).

9        There is no reason to disturb the Court of Appeal's holding.  Petitioner's claim is

10   barred by procedurally default because of his failure to object at trial.  See supra Part C.1;

11   Davis v. Woodford, 384 F.3d 628, 653-54 (9th Cir. 2004); Vansickel v. White, 166 F.3d

12   953, 957-58 (9th Cir. 1999).  Alternatively, his claim also fails on the merits.  The state

13   appellate court reasonably determined that the instruction, in light of the instructions as a

14   whole, could not have misled the jury.  The court's robbery example did not suggest to

15   the jury that circumstantial evidence is always highly probative of guilt.  In fact, the trial

16   court expressly stated that "[n]either [direct nor circumstantial evidence] is entitled to any

17   greater weight than the other."  Ex. D at 26.

18        Petitioner has failed to show that the instructional error rendered the trial so

19   fundamentally unfair that he was denied due process.  See Estelle v. McGuire, 502 U.S. at

20   72-73.  As such, the California Court of Appeal reasonably concluded that there was no

21   reasonable likelihood the jury applied the challenged instruction in a way that violates the

22   Constitution.  See Middleton v. McNeil, 124 S.Ct. at 1832.  Therefore, petitioner's claim

23   fails.

24   / / /

25   / / /

26   / / /

27

28                                                            20

United States District Court

For the Northern District of California

### F.   Prosecution's Improper Reference to Related Testimony by Victim's Mother During Closing Argument

Petitioner claims that the prosecutor committed prejudicial misconduct by allowing Ryan's mother to testify on cross-examination that both her sons had been molested and by referring to the testimony during closing argument.

The California Court of Appeal held that there was no merit to Renderos's contentions:

> Renderos argued on appeal his conviction should be reversed because the trial prosecutor failed to prevent Ryan's mother, Lisa, from testifying on cross-examination both her sons had been molested,[9] and the prosecutor did not avow Lisa's testimony (which had been stricken), but instead referred to it during her closing statement to the jury, when she argued: "I think what you saw from [Lisa] was some really righteous emotion on the witness stand. She was upset . . . . [¶]  What she said, you know, was emotional. I don't think you can read that to say she was somehow making these things

---

[9] The transcript of Lisa's testimony during cross-examination, in context, with the challenged portion italicized, reads as follows:

"Q. . . . [W]hat kind of relationship did you have with your son, Ryan?
"A.  What kind of relationship did I have with my son, Ryan?
"Q.  During the time period '92 to '96?
"A.  Ryan had some signs of dysfunction. There was no doubt. He had some anger issues. I took Ryan to psychologists. I took him to psychiatrists. Um, from the period of six grade to the present he's been in about eight different schools. I have met with special education. . . . I didn't know what the problem was with Ryan . . . . [¶]  He's never been in trouble outside of our home. Everything has always been centered from our home. He would get angry, punch a door, hit the wall, things like this. I didn't know why.
"Q.  You are saying this all occurred approximately around 1992?
"A.  No, it started a little later . . . . [¶]  It started later.
"Q.  It's fair to say this type of behavior was never present in Ryan before?
"A.  No.
"Q.  1992?
"A.  No, both of my boys, and I say both of my boys have had problems, both my boys have been molested.
[Defense Counsel]:  Objection, move to strike, your Honor.
The Court:  Sustained.
[Defense Counsel]:  Nonresponsive.
The Court:  The jury will disregard the last sentence, please.
[Lisa]:  Don't shake your head like that. Don't do it.
The Court:  Ms. C[], there is no question before you, please."

The transcript does not indicate to whom Lisa is directing her remark regarding the shaking of a head. It appears likely, however, that it was directed towards Renderos.

United States District Court
For the Northern District of California

1    up to help the case along . . . . [¶]  When we are talking about, you know,
     credibility, you can look at the witness's demeanor while they are testifying.
2    You can look at Lisa . . . , what she did, what she said, her emotions."
     There is no merit to Renderos's contentions regarding the prosecutor's
3    conduct.

4    The record does not contain any evidence the prosecutor knew or should
     have known Lisa was going to mention both her sons had been molested.
5    Moreover, the trial court directed the jury to disregard the testimony, and
     we assume the jury followed that instruction.  Further, Renderos did not
6    object or request any cautionary instruction regarding either Lisa's conduct
     or the prosecutor's references to the emotional nature of Lisa's conduct on
7    the witness stand.  In any event, to the extent any of the challenged
     comments were erroneous or inappropriate, it is not reasonably probable a
8    different result would have been reached in the absence of those remarks.

9    Ex. D at 24-25 (footnote renumbered and citations omitted).

10        Prosecutorial misconduct may serve as a basis for federal habeas relief.  The

11   appropriate standard of review is the narrow one of due process and not the broad

12   exercise of supervisory power.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A

13   defendant's due process rights are violated when a prosecutor's misconduct renders a trial

14   "fundamentally unfair."  See id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he

15   touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

16   fairness of the trial, not the culpability of the prosecutor").  Claims of prosecutorial

17   misconduct are reviewed "on the merits, examining the entire proceedings to determine

18   whether the prosecutor's remarks so infected the trial with unfairness as to make the

19   resulting conviction a denial of due process."  Johnson v Sublett, 63 F.3d 926, 929 (9th

20   Cir. 1995) (citation omitted).

21        The first factor in determining the prejudicial effects of misconduct is whether the

22   trial court issued a curative instruction.  When a curative instruction is issued, a court

23   presumes that the jury has disregarded inadmissible evidence and that no due process

24   violation occurred.  See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987); Darden, 477 U.S.

25   at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but

26   held that the trial was fair since curative actions were taken by the trial judge).  This

27

28                                          22

For the Northern District of California

1  presumption may be overcome if there is an "overwhelming probability" that the jury

2  would be unable to disregard evidence and a strong likelihood that the effect of the

3  misconduct would be "devastating" to the defendant.  See Greeg, 483 U.S. at 766 n.8.

4        Here, immediately after Ryan's mother testified that both boys had been molested,

5  the state trial court ordered the jury to disregard the testimony.  It was not unreasonable

6  for the Court of Appeal to assume that the jury followed the instruction.  Petitioner has

7  made no showing that there was an "overwhelming probability" the jury would have been

8  unable to disregard the stricken evidence.  Moreover, petitioner has presented nothing to

9  support an inference that the prosecutor was on notice that Ryan's mother would make

10  the statement.  See Ex. D at 25.  To the extent any of the challenged remarks in closing

11  argument were erroneous or inappropriate, it is "not reasonably probable a different result

12  would have been reached in the absence of those remarks."  Ex. D at 25.  Put simply, the

13  California Court of Appeal reasonably determined that there was neither misconduct nor

14  actual prejudice from the mother's testimony or the prosecutor's closing argument.

   **G.    Ineffective Assistance of Counsel**

15

16        Petitioner claims that his Sixth and Fourteenth Amendment rights to effective

17  assistance of counsel were violated by counsel's failure to: (1) challenge the prosecution's

18  amendment to add section 803(g) claims to the information; (2) object to the admission of

19  propensity evidence and request a limiting instruction; (3) object to prosecution's closing

20  argument regarding the mother's other crimes accusation; and (4) cross-examine on

21  financial interest.  Petitioner also requests an evidentiary hearing on these claims.

   **1.    Legal Standard**

22

23        A claim of ineffective assistance of counsel is cognizable as a claim of denial of

24  the Sixth Amendment right to counsel, which guarantees not only assistance, but effective

25  assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The

26  benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

27

28                                    23

1   undermined the proper functioning of the adversarial process that the trial cannot be

2   relied upon as having produced a just result.  Id.

3        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

4   petitioner must establish two things.  First, he must demonstrate that counsel's

5   performance was deficient, i.e., that it fell below an "objective standard of

6   reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.

7   The relevant inquiry is not what defense counsel could have done, but rather whether the

8   choices made by defense counsel were reasonable.  See Babbitt v. Calderon, 151 F.3d

9   1170, 1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly

10  deferential, and a court must indulge a strong presumption that counsel's conduct falls

11  within the wide range of reasonable professional assistance.  See Strickland, 466 U.S. at

12  689.  It is unnecessary for a federal court considering a habeas ineffective assistance

13  claim to address the prejudice prong of the Strickland test if the petitioner cannot even

14  establish incompetence under the first prong.  See Siripongs v. Calderon, 133 F.3d 732,

15  737 (9th Cir. 1998).  Second, he must establish that he was prejudiced by counsel's

16  deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

17  unprofessional errors, the result of the proceeding would have been different."

18  Strickland, 466 U.S. at 694.  A reasonable probability is a probability sufficient to

19  undermine confidence in the outcome.  Id.

20        The Strickland framework for analyzing ineffective assistance of counsel claims is

21  considered to be "clearly established Federal law, as determined by the Supreme Court of

22  the United States" for the purposes of 28 U.S.C. section 2254(d) analysis.  See Williams

23  (Terry) v. Taylor, 529 U.S. 362, 404-09 (2000).

24        **2.    Failure to Challenge Addition of 803(g) Claims to Information**

25        The California Court of Appeal found no legal basis under state law for petitioner

26  to succeed on a motion to dismiss the amended charges under section 803(g).  As a result,

27

28                                         24

*(left margin, vertical text)* United States District Court  For the Northern District of California

counsel's failure to make the motion did not establish prejudice and cannot support a claim of ineffective assistance:

> [E]ven if Renderos's trial counsel had objected to the information or any amendment to the information on the basis the prosecutor could not add factual allegations under section 803(g), such a challenge would have been futile.  Under section 1009, the trial court was authorized to grant the prosecutor's request to amend the information by including those allegations.  (<u>Chadd</u>, <u>supra</u>, 28 Cal.3d at p. 758.)  Renderos has not shown the addition of the factual allegations under section 803(g) prejudiced his substantial rights.  (See § 960 ["[n]o accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits"].)  At all times, Renderos was aware of the time periods during which the offenses happened, and he testified at length without alleging he was unable to mount a proper defense.  Even if the trial court erred in allowing the amendment, when the statute of limitations issue is tried to a jury, any deficiency in the pleading in that regard no longer matters.  (<u>People v. Williams</u> (1999) 21 Cal.4th 335, 346 [if the record shows the action is not time-barred, "the conviction will stand despite the prosecution's error in filing an information that appeared time-barred"].)

Ex. D at 34.

Petitioner contends that the state appellate court's reliance on <u>People v. Chadd</u>, 28 Cal.3d 739 (1981) was incorrect because the case itself was based on an "obsolete" holding that the statute of limitations was not an element of the offense.  Petitioner's Memorandum at 11.  Petitioner claims that because the parties waived preliminary examination, state law prohibited new charges in the amended information, including charges that become "new" when new elements are added.

For the reasons discussed earlier, the state court's interpretation that the statute of limitations is not an "element" of the offense is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  <u>See</u> <u>supra</u> Part B.  Moreover, it was reasonable for the Court of Appeal to find that no prejudice could have ensued from counsel's failure to challenge the amended information.  Therefore, petitioner's claim fails.

/ / /

United States District Court

For the Northern District of California

### 3.   Admission of Propensity Evidence and Absence of Limiting Instruction

As discussed earlier, the California Court of Appeal reasonably held that the admission of the propensity evidence was harmless beyond a reasonable doubt.  Ex. D at 23.  Therefore, there was no prejudice under <u>Strickland</u>, and his claim fails.

### 4.   Failure to Object to Prosecution's Closing Argument

Petitioner claims that counsel's failure to object to the prosecution's closing argument regarding testimony by Ryan's mother, Lisa, who testified on cross-examination that both her sons had been molested, violated his right to effective assistance of counsel. <u>See</u> <u>supra</u> Part F (discussing prosecution's closing argument and relevant portions of Lisa's testimony).

The California Court of Appeal reasonably found the comments to be harmless "to the extent any of the challenged comments were erroneous or inappropriate[.]"  Ex. D at 25.  As such, petitioner fails to satisfy the prejudice prong of the <u>Strickland</u> test. Moreover, counsel's decision not to object is often a question of professional judgment that should not be second-guessed.  <u>See</u> <u>Garcia v. Bunnell</u>, 33 F.3d 1193, 1199-1200 (9th Cir. 1994) ("[M]any trial lawyers refrain from objecting during closing arguments to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality").  Therefore, petitioner's claim fails.

### 5.   Failure to Cross-Examine on Financial Interest

Petitioner also claims that counsel was ineffective for failing to cross-examine Ryan and his mother, Lisa, on the grounds that "(1) Renderos had lent money to Lisa, which she did not want to repay to him" and "(2) Ryan planned to file a civil action for monetary damages if Renderos was convicted."   Ex. D at 35.  Renderos claims that his trial counsel was aware of these issues, but simply forgot to bring them up during cross-examination.

The California Court of Appeal rejected this argument:

> We accept, for the purpose of argument, that defense counsel had no
> "tactical reason" for not questioning Ryan and Lisa regarding any financial
> motives for their testimony, and counsel meant to question the witnesses but
> he merely forgot.  Nevertheless, in determining whether counsel's failure
> was prejudicial, we evaluate the entire record, not the single error in
> isolation.  Defense counsel did impeach both Ryan and Lisa, noting their
> recollections of the events in question were contradictory, there was a lack
> of corroborative physical evidence, and Ryan's trial testimony was
> contradicted by his earlier statements to the police.  To the extent defense
> counsel could or should have questioned the witnesses about their financial
> motives for pursuing charges against Renderos, defense counsel's failure to
> so question the witnesses does not "undermine [our] confidence in the
> outcome."  (People v. Riel (2000) 22 Cal.4th 1153, 1175.)  The testimony
> of the witnesses would have helped only if the witnesses admitted Lisa
> owed a debt to Renderos that she did not want to repay, and at the time of
> trial, Ryan was planning to file a civil lawsuit for monetary damages.
> However, Lisa was not a percipient witness to any of the acts of sexual
> molestation and her testimony was not critical to Renderos's convictions.
> Although Ryan's credibility was central to the case, there was independent
> evidence that corroborated his allegations, namely, Renderos's telephone
> statements.  Thus, it is highly unlikely a jury would draw such a negative
> inference from the filing of a civil lawsuit for damages or a dispute over
> money owed to Renderos that it would have acquitted him.  We cannot say
> the verdict was "rendered unreliable by a breakdown in the adversary
> process caused by deficiencies in counsel's assistance."  (Strickland v.
> Washington, supra, 466 U.S. at p. 702.).

Ex. D at 36.

The state appellate court reasonably concluded that petitioner failed to establish
prejudice under the Strickland test.  See Strickland, 466 U.S. at 694.  Petitioner fails to
demonstrate a reasonable probability that, but for counsel's failure to cross-examine on
financial interest, the result of the proceeding would have been different.  Therefore,
petitioner's claim for habeas relief fails.

**6.    Request for an Evidentiary Hearing**

Because petitioner's ineffective assistance of counsel claims can be resolved by
reference to the state court record, the Court denies his request for an evidentiary hearing.
See Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998).

/ / /

**United States District Court**

For the Northern District of California

### H.    Cumulative Error

Finally, petitioner urges the Court to consider whether the alleged various errors rendered his trial cumulatively unfair, thus requiring reversal of his conviction.  It is true that, although individual errors may not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights.  Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).  However, here petitioner has not demonstrated constitutional error that would have had a substantial and prejudicial effect on the jury's verdict.

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. It is further ordered that petitioner's request for evidentiary hearing is DENIED.

**IT IS SO ORDERED.**

Dated: July 7, 2005



_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2004\5250\Order 1a.wpd                28